E-FILED
Monday, 31 October, 2022 02:08:20 PM
Clerk, U.S. District Court, ILCD

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| **MARIA LOPEZ and ALEXIS BROWN,** | ) | |
| **individually and on behalf of all others** | ) | |
| **similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. 21-CV-2317** |
| | ) | |
| **RING, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### <u>ORDER</u>

Defendant, Ring, LLC, ("Ring") filed a Motion to Compel Arbitration or Dismiss First Amended Class Action Complaint (#19) on July 29, 2022. Plaintiffs, Maria Lopez and Alexis Brown, individually and on behalf of all others similarly situated, filed their Response (#21) on August 30, 2021. For the following reasons, Ring's Motion to Compel Arbitration or Dismiss First Amended Class Action Complaint (#19) is GRANTED.

### BACKGROUND

The following background is taken from the allegations in Plaintiffs' Amended Complaint (#16). At this stage of the proceedings, the court must accept as true all material allegations of the Amended Complaint, drawing all reasonable inferences therefrom in Plaintiffs' favor. See *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 966 (7th Cir. 2016). Further, in considering a motion to compel arbitration, the court may consider exhibits and affidavits regarding the arbitration agreement, as courts

deciding motions to compel arbitration apply a summary judgment standard in accordance with Federal Rule of Civil Procedure 56(c).  *McClenon v. Postmates, Inc.*, 473 F.Supp.3d 803, 808 (N.D. Ill. 2020).

*Allegations in Amended Complaint*

<u>General Allegations</u>

Ring is the leader in home security technology through the sale of its Ring doorbells, which allow people to see what is happening outside of their residence. Ring manufactures, labels, markets, and sells a video doorbell ("the Product") under the Ring brand.  The Product's battery life is represented as between 6 and 12 months.  However, this is a maximum duration, under minimal usage, in an ideal environment.  Most customers will not get two months of normal usage from a full battery charge, and will experience "accelerated battery depletion" ("ABD").  "Normal usage" refers to 750-1,000 events which a fully charged battery can endure.  An event refers to any activity, such as pushing a button, motion trigger, recording, live viewing, or speaking through the camera.  Motion triggers include deliveries, people walking down the block, cars, and even wind which causes movement of leaves.  Reports show that the average house may have up to 50 motion triggers a day, which means 1,500 events in one month.  Each event drains the battery by sending recorded data to cloud storage via Wi-Fi.

When the temperature decreases to around 36 degrees Fahrenheit, the Product's ability to retain a charge diminishes.  Below this temperature, the battery may and often does fail.  Customer service typically points dissatisfied users to other external causes for ABD, such as cold weather, distance from the router, and Wi-Fi signal strength.

ABD occurs even when users have modified their settings to restrict motion triggers to no more than five events per day.  While Ring sells a solar charger to charge the battery, it is defectively designed with high failure rates.  Moreover, the power source will not cause the battery to retain its charge any longer.  Even when the Product is hardwired, ABD persists.

ABD significantly reduces the functionality of the Product.  When a battery must be recharged frequently, "it is a chore."  During the several hours when the Product is unmounted from the wall to recharge the battery, a user's home is vulnerable to the exact condition they purchased the Product to avoid: not being able to see who is at or near their door.  Even the removable batteries fail to solve this issue, for reasons including their additional cost and numerous repetitive setup steps.  Lastly, the push button suffers from a design flaw where it will easily split, often occurring outside of the warranty period, and Ring does not replace or repair the Product.  Since the button is fundamental to the doorbell, this significantly impacts users.

The Product contains other representations which are misleading.  Had Plaintiffs known the truth, they would not have bought the Product or would have paid less for it.  The Product is sold for a price premium compared to other similar products, no less than between $60 and $300 per unit, based on make and model, with the solar charger costing $75, a higher price than it would otherwise be sold for absent the misleading representations and omissions.

Parties

Ring is a Delaware limited liability company with its principal place of business in California.  Ring's parent company is Amazon.com, Inc., which acquired Ring in 2018.  Ring transacts business throughout the country.  In the Central District of Illinois it transacts business through the sale of the Product directly to residents from its website, Amazon's website, or through third-parties such as Best Buy and the QVC home shopping channel.

Plaintiff Lopez is a citizen of Decatur, Macon County, Illinois, and Plaintiff Brown is a citizen of Philadelphia, Philadelphia County, Pennsylvania.

Allegations Specific to Plaintiffs

As part of Amazon, Ring has embraced Amazon's "customer-centric culture." Plaintiffs were aware of this commitment to customer satisfaction when they bought the Product, because they knew if anything went wrong Ring, or Amazon, would "make it right."

Plaintiffs purchased the Product and the above-described accessories "on one or more occasions within the statutes of limitations for each cause of action alleged." Plaintiff Lopez purchased the Product at stores including QVC, QVC.com, or the QVC television channel between December 2020 and June 2021, among other times.  Plaintiff Brown purchased at stores including Amazon.com between 2019 and 2021, among other times.

4

Plaintiffs bought the Product because they expected that it would maintain its charge for the length of time represented, and that this duration would be determined by considering realistic usage. They expected that it would not contain any defective parts, and that the solar charger functioned as promised because that is what the representations implied and said. Plaintiffs relied on the words and images on the Product, on the labeling, and statements, and/or claims made by Ring in digital, print, and/or social media that accompanied the Product.

Plaintiffs bought the Product at or exceeding the above-referenced price. Plaintiffs would not have bought the Product if they knew the representations and omissions were false and misleading, or they would have paid less for it. They chose between Ring's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or components. The Product was worth less than what Plaintiffs paid and they would not have paid as much absent Ring's false and misleading statements and omissions.

Count I of the Amended Complaint alleges a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") (815 Ill. Comp. Stat. 505/1, et seq.).

Count II alleges Illinois common law breaches of express warranty, implied warranty of merchantability/fitness for a particular purpose, and the federal Magnuson Moss Warranty Act (15 U.S.C. § 2301, et seq.).

Count IV alleges Illinois common law negligent misrepresentation.

Count V alleges Illinois common law fraud.

Count VI alleges Illinois common law unjust enrichment.

Plaintiffs seek the certification of a class, injunctive relief directing Ring to correct the challenged practices and to remove or correct the alleged misrepresentations, and monetary, statutory, and/or punitive damages.

*Arbitration Clause*

Ring attached to its Motion the Declaration of John Modestine (#19-3). Modestine is the director of design at Ring, and has worked there since December 2014.  He is currently responsible for the Ring Mobile App Product Management and Product Design.  Based on his work and responsibilities, he is familiar with the agreements, products, and practices that he discusses in his Declaration, and makes the Declaration based on his own personal knowledge.

Modestine states that the exterior packaging of all Ring video doorbells produced from 2017 until mid-2020 states that "[u]se of the product is subject to your registration with Ring and your agreement to the Terms of Service found at www.ring.com" or that "[u]se of the product is subject to your registration with Ring and your agreement to the Terms of Service found at www.ring.com/terms" Modestine attached as Exhibit A to his Declaration (#19-4) a copy of the relevant portions of the exterior packaging for the Product from April 2018.  The exterior packaging for all other Ring video doorbells produced from 2017 to mid-2020 presented the above-described language requiring a user's agreement to Ring's Terms of Service in substantially the same location and format as in the image in Exhibit A.

Modestine states that the exterior packaging from of all Ring doorbells produced since mid-2020 state that "[b]y purchasing or using the product, you agree to the Terms of Service found at www.ring.com/terms" or "[b]y purchasing or using the product, you agree to the Terms of Service found at ring.com/terms."  Modestine attached as Exhibit B to his Declaration (#19-5) a copy of the relevant portions of the exterior packing for the Product from July 2020.  The exterior packaging for all other Ring video doorbells produced since mid-2020 present the above-described language requiring a user's agreement to Ring's Terms of Service in substantially the same location and format as this image.

From May 2018 through the present, the webpage www.ring.com/terms has set forth Ring's Terms of Service.  Those Terms of Service may also be accessed from the www.ring.com homepage by clicking on the "Terms of Service" hyperlink located on the homepage.  Modestine attached to the Declaration Ring's various Terms of Service as they appeared since 2018: (#19-6) August 1, 2018 to October 23, 2019; (#19-7) October 23, 2019, to January 7, 2020; (#19-8) January 7, 2020 to March 4, 2020; (#19-9) March 4, 2020 to December 8, 2020; (#19-10) December 8, 2020 to September 28, 2021; (#19-11) September 28, 2021 to April 12, 2022; and (#19-12) April 12, 2022, to present.

Each version of the Terms of Service from August 1, 2018, to present contains an arbitration agreement and a class action waiver.  Additionally, in the very first or second paragraph of each version of the Terms of Service from June 9, 2017, to present Ring provided a hyperlink to quickly access the specific terms providing for arbitration and the class action waiver.

7

Each version of Ring's Terms of Service from August 18, 2017 until present has included a hyperlink to the Dispute Resolution section of the Terms via the words "<u>DISPUTE RESOLUTION</u>" in all caps in the first paragraph of the Terms. Each version of Ring's Terms of Service in effect from June 9, 2017 to October 23, 2019, contained the terms of Ring's return policy. Each version of Ring's Terms of Service in effect from October 23, 2019, to present have provided a hyperlink to Ring's return policy and included certain terms of that policy in the Terms of Service itself.

Since at least 2016, to set up and manage the Product, Ring customers[1] have been required to download the Ring mobile application ("Ring app") and register for a Ring account through the Ring app or through Ring's website. A customer could download the Ring app from Apple's "App Store," Google's "Google Play" store, or by visiting www.ring.com/app. A customer could not set up a Ring device or access the Ring app without going through the registration process and accepting Ring's Terms of Service. Likewise, a customer could not create a Ring account via the Ring app or website going through the registration process and accepting Ring's Terms of Service. A person could not be a shared user of another person's Ring devices without creating their own Ring account.

From October 2018 until May 2019, final step of the Ring app account registration process was a "Password Creation" page. On that page, the customer was asked to create a password for the account. The page stated: "By signing up, you agree to our

---

[1]The court will use the terms "customers" and "users" interchangeably throughout this Order.

8

Terms of Service."  The underlined text denoted a hyperlink to the Terms of Service found on Ring's website.  A customer who clicked the hyperlink was routed to the full version of Ring's Terms of Service, including the arbitration agreement and waiver of class provision.  The quoted language was prominently displayed immediately below where a customer was required to input a password.  Modestine attached a copy of the "Password Creation" page (#19-13) as it would have appeared to a customer registering for a Ring account via the Ring app from October 2018 to May 2019.

After entering a password, a customer was required to tap or click the "Done" button on the "Password Creation" page to create a Ring account.  By entering a password and clicking the "Done" button, a customer accepted Ring's Terms of Service. Only after clicking "Done" was a customer then able to set up a Ring device that he or she purchased for use.

The Ring app account registration process was revised in May 2019.  The last step of the May 2019 account registration process is a "Password Creation" page.  On the May 2019 page, the customer was asked to create a password for the account.  The page contained a "Create Account" button, directly above which was the statement: "By continuing you agree to Ring's Terms of Service."  "Terms of Service" appeared in blue text, which denoted a hyperlink to the Terms of Service found on Ring's website.  A customer who clicked on the hyperlink was routed to the full version of the Terms of Service, including the arbitration agreement and waiver of class provision.  The quoted language was prominently displayed immediately above where a customer was required to click the "Create Account" button to continue.  Modestine attached to his

9

Declaration a copy (#19-14) of the "Password Creation" page that appeared to a customer registering for a Ring account via the Ring app from May 2019 to September 2020.

After entering a password, the customer was then required to click the "Create Account" button on the "Password Creation" page to create a Ring account. By entering a password and clicking the "Create Account" button, a customer accepted Ring's Terms of Service. Only after clicking "Create Account" was a customer then able to set up a Ring device that they purchased for use.

In September 2020, the "Password Creation" page in the Ring app account registration process was revised yet again, this time to incorporate enhanced password security requirements. As before, the customer was asked to create a password and to agree to the Terms of Service on the "Password Creation" page. This page contains a "Create Account" button, directly above which was the statement "By continuing, I agree to Ring's Terms of Service." Again, "Terms of Service" was in blue text, which denoted a hyperlink to the Terms of Service found on Ring's website. A customer who clicked on the hyperlink was routed to the full version of Ring's Terms of Service, including the arbitration and waiver of class provisions. The hyperlink to the Terms of Service is the first hyperlink that appears in the "Password Creation" portion of the page. Modestine attached to his Declaration a copy (#19-15) of the "Password Creation" page that appeared to a customer registering for a Ring account via the Ring app from September 2020 onward. As before, after entering a password, a customer

10

must tap the "Create Account" button on the "Password Creation" page to create a Ring account.  By entering a password and clicking the "Create Account" button, a customer accepted Ring's Terms of Service.

The process for creating a Ring account using Ring's website was almost identical to the process described above for creating a Ring account using the Ring app, requiring users to check a box during the website account registration process to indicate agreement to the Terms of Service before moving on to the next step (February 2018 to April 2019) or requiring users to click a "Create Account" button directly below the text stating "By continuing you agree to Ring's Terms of Service" (since April 2019).

The Terms of Service themselves make very clear, from the very first line, that the agreement the user has assented to is subject to arbitration, stating: "IMPORTANT NOTICE: THIS AGREEMENT IS SUBJECT TO ARBITRATION AND A WAIVER OF CLASS ACTION RIGHTS AS DETAILED IN THE <u>DISPUTE RESOLUTION</u> SECTION."

In all relevant versions of the Terms of Service, the first paragraph under the heading "Terms of Service" summarized important provisions, including stating that the Terms of Service contain an arbitration agreement and warning the user that arbitration on an individual basis means that the user waves the right for a judge or jury to decide his claim.  Within that paragraph, the arbitration agreement is hyperlinked to take the user directly to that provision.  The "Dispute Resolution" section of the Terms of Service, which is also hyperlinked, is in all caps, directs the user to read it carefully, and states that the user and Ring agree that any dispute or claim rising out of the user's use of the services and the products to the agreement "SHALL BE RESOLVED ONLY

BY FINAL AND BINDING, BILATERAL ARBITRATION."  The section also states the Federal Arbitration Act applies to the agreement and governs all questions as to whether a dispute is subject to arbitration.  The section then describes the arbitration process in detail, including a hyperlink to the applicable JAMS (formerly known as the Judicial Arbitration and Mediation Services) rules for arbitration.

The Terms of Service define "Disputes" broadly.  Additionally, during the relevant time, the Terms of Service included a delegation clause that provided that the arbitrator shall have the exclusive authority to resolve all disputes arising out of or relating to the Terms of Service, including "whether a claim is subject to arbitration."

ANALYSIS

Ring argues that: (1) this case must be sent to arbitration because Plaintiffs bound themselves to Ring's Terms of Service when they (a) purchased and used the Product after being notified on the Product's exterior packaging that those acts would bind them to the Terms of Service and (b) they agreed for a second time to Ring's Terms of Service when creating a Ring account; and (2) that, in the alternative to arbitration, the case should be dismissed for failure to state a claim in that (a) Plaintiffs do not plead their fraud-based claims with particularity as required by Federal Rule of Civil Procedure 9(b); (b) Plaintiffs' Amended Complaint fails to plead the essential elements of their breach of warranty claims; and (c) the economic loss doctrine bars Plaintiffs' negligent misrepresentation claim.

*Arbitration*

Ring argues that this case must be sent to binding arbitration because the arbitration provision of its Terms of Service governs Plaintiffs' claims, and that Plaintiffs agreed to be bound by the arbitration agreement when they agreed to Ring's Terms of Service upon purchase of the Product and their creation of a Ring account.

<u>Arbitration Law</u>

"The Federal Arbitration Act ("FAA") [9 U.S.C. § 1 et seq.] was originally enacted 'to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts.'" *Kawasaki Heavy Industries, Ltd. v. Bombardier Recreational Products, Inc.*, 660 F.3d 988, 994 (7th Cir. 2011), quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991). "In furtherance of this goal, the FAA 'provides for stays of proceedings in federal district courts when an issue in the proceeding is referable to arbitration, § 3, and for orders compelling arbitration when one party has failed, neglected, or refused to comply with an arbitration agreement, § 4.'" *Kawasaki*, 660 F.3d at 994, quoting *Gilmer*, 500 U.S. at 25; 9 U.S.C. §§ 3-4. The FAA reflects a "liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).

"Under the FAA, a court must compel arbitration 'if three elements are present: (1) an enforceable written agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal to arbitrate.'" *Vandehey v. Asset Recovery Solutions, LLC*, 2018 WL 6804806, at *6 (E.D. Wis. Dec. 27, 2018), quoting *A.D. v. Credit*

13

*One Bank, N.A.*, 885 F.3d 1054, 1060 (7th Cir. 2018). "[O]nce an enforceable arbitration contract is shown to exist, questions as to the scope of arbitrable issues should be resolved in favor of arbitration." *Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 752 (7th Cir. 2017).

As the party seeking to compel arbitration, Ring bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence. *Mohammed v. Uber Technologies, Inc.*, 2018 WL 1184733, at *5 (N.D. Ill. Mar. 7, 2018). However, once the existence of the agreement to arbitrate is shown, Plaintiffs, as the party seeking to invalidate or oppose the arbitration agreement, bear "the burden of demonstrating that the arbitration agreement is unenforceable and that the claims are unsuitable for arbitration." *Paragon Micro, Inc. v. Bundy*, 22 F.Supp.3d 880, 887 (N.D. Ill. 2014). Further, "[a] party opposing a motion to compel arbitration bears the burden of identifying a triable issue of fact as to the existence of the purported arbitration agreement." *Mohammed v. Uber Technologies, Inc.*, 237 F.Supp.3d 719, 725 (N.D. Ill. 2017), citing *Tinder v. Pinkerton Security*, 305 F.3d 728, 735 (7th Cir. 2002). The opposing party's evidentiary burden is akin to that of a party opposing summary judgment under Federal Rule of Civil Procedure 56, in that "'a party cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial.'" *Mohammed*, 237 F.Supp.3d at 725, quoting *Tinder*, 305 F.3d at 735. The court must believe the evidence of the party opposing arbitration and draw all justifiable inferences in its favor. *Mohammed*, 237 F.Supp.3d at 725.

14

<u>What Law Governs</u>

"Federal courts must rely on state contract law governing the formation of contracts to decide whether the parties have agreed to arbitrate a particular issue." *Paragon*, 22 F.Supp.3d at 887.  In other words, they "look to state contract law to determine whether a valid arbitration agreement exists between parties."  *Paragon*, 22 F.Supp.3d at 887.  When, such as in this case, the federal court's jurisdiction over the plaintiffs' claims is based on the parties' diversity of citizenship,[2] the court, as a general rule, "'look[s] to the substantive law of the state in which the district court sits, including choice of law rules[.]'" *Jackson v. Payday Financial, LLC*, 764 F.3d 765, 774 (7th Cir. 2014), quoting *Wachovia Securities, LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751 (7th Cir. 2012) (internal citations omitted).

The forum state is Illinois.  However, the Terms of Service, post-August 1, 2018, contain a "Jurisdiction and Choice of Law" section which states "These Terms shall be governed by and construed in accordance with the laws of the State of California and the United States of America, without giving effect to any principles of conflicts of law."

---

[2]When a case is in federal court as a putative class action under the Class Action Fairness Act, the court still analyzes the claim as being in court on diversity grounds on issues such as choice-of-law, and applies the choice-of-law rules of the forum state.  See *Texas Hill Country Landscaping, Inc. v. Caterpillar, Inc.*, 522 F.Supp.3d 402, 411 (N.D. Ill. 2021); *Sosa v. Onfido, Inc.*, 8 F.4th 631, 637 (7th Cir. 2021).  Further, although Plaintiffs make a claim under the federal Magnuson Moss Warranty Act, that statute has additional criteria to invoke federal question jurisdiction.  *Ware v. Best Buy Stores, L.P.*, 6 F.4th 726, 731 (7th Cir. 2021).  The statute "provides that federal courts do *not* have federal-question jurisdiction over breach-of-warranty actions under the Act ... 'if the action is brought as a class action, and the number of named plaintiffs is less than one hundred.'" *Ware*, 6 F.4th at 731, quoting 15 U.S.C. § 2310(d)(3)(C) (emphasis in *Ware*).  That is the case in this instant action, so there is no federal question jurisdiction.

Ring argues that California law should govern whether the arbitration agreement is valid and enforceable. "Federal district courts exercising diversity jurisdiction are to apply the choice of law principles of the forum state to determine which state's substantive law governs the proceeding." *Falkenberg v. CB Tax Franchise Systems, LP*, 2009 WL 10681238, at *1 (S.D. Ill. Mar. 24, 2009). "Then looking at Illinois' choice-of-law rules, 'a court must honor a contractual choice of law unless the parties' choice of law would violate fundamental Illinois public policy and Illinois has a materially greater interest in the litigation than the chosen state.'" *Evoqua Water Technologies, LLC v. AFAM Concept Inc.*, 2022 WL 117769, at *2 (N.D. Ill. Jan. 12, 2022), quoting *Life Plans, Inc. v. Security Life of Denver Ins. Co.*, 800 F.3d 343, 357 (7th Cir. 2015).

Plaintiffs, in their Response, did not respond to Ring's argument that California law should govern the arbitration issue. Failure to respond to an opposing party's arguments concedes those points and arguments. *Noble Roman's, Inc. v. Union Valley Tiger Mart*, 2015 WL 4876074, at *3 (S.D. Ind. Aug. 14, 2015), citing *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument ... results in waiver," and "silence leaves us to conclude" a concession.); *Myers v. Thoman*, 2010 WL 3944654, at *4 (S.D. Ind. Oct. 6, 2010) ("The Seventh Circuit has clearly held that a party who fails to respond to points made ... concedes those points." ); *Cintora v. Downey*, 2010 WL 786014, at *4 (C.D. Ill. Mar. 4, 2010) ("The general rule in the Seventh Circuit is that a party's failure to respond to an opposing party's argument implies concession.").

This rule applies when a party fails to contest a choice of law issue.  See *Savis, Inc. v. Cardenas*, 528 F.Supp.3d 868, 878 (N.D. Ill. 2021) ("As Savis argues in its reply, Dkt. No. 167 at 1-2, '[t]he choice-of-law issue is waived if a party fails to raise it.'").

Therefore, the court finds that Plaintiffs have waived any argument in opposition and thus conceded that California law applies to determine  the validity of the arbitration agreement and its applicability to this case.  The court would note that the choice of law provision at issue is only a *choice* of law, and not a *forum selection* clause, thus this court is only applying California law, and not transferring the case to a California court.  Ring has made no argument that this court should do so.

Analysis Under California Law

Ring argues that Plaintiffs agreed to Ring's terms by: (1) purchasing and/or using the Product based on the "actual or constructive notice of the Terms" provided by the exterior packaging of the Product that directed purchasers to Ring's website, where the Terms of Service were located; and (2), alternatively, Plaintiffs assented to the Terms of Service, including the arbitration agreement, by creating a Ring account.  Plaintiffs respond that: (1) they did not have reasonable notice based on the packaging and website; and (2) Plaintiffs did not manifest assent to the Terms of Service through creating a Ring account because: (a) the Ring registration process did not require "affirmative action" by Plaintiffs to agree to the terms of contract other than their use of the service, and thus was not a "clickwrap" agreement; and (b) though Plaintiffs "encountered the Terms at the same time they consummated their registration,"

Plaintiffs were not put on notice of their assent to the Terms because the screen was cluttered with "numerous hyperlinks" so that Plaintiffs were distracted and whatever notice was provided by the Terms of Service was diluted.

To determine whether a valid arbitration agreement exists, federal courts apply ordinary state law principles that govern the formation of contracts. *Dohrmann v. Intuit, Inc.*, 823 Fed.Appx. 482, 483 (9th Cir. Aug. 11, 2020). "The internet has 'not fundamentally changed the requirement that mutual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract.'" *Dohrmann*, 823 Fed.Appx. at 483, quoting *Long v. Provide Commerce, Inc.*, 200 Cal.Rptr.3d 117, 123 (Cal. Ct. App. 2016). "Under California law, '[c]ourts must determine whether the outward manifestations of consent would lead a reasonable person to believe the offeree has assented to the agreement.'" *Lee v. Ticketmaster, LLC*, 817 Fed.Appx. 393, 394 (9th Cir. June 12, 2020), quoting *Knutson v. Sirius XM Radio, Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). Mutual assent does not require that the offeree have *actual* notice of the terms of an arbitration agreement, but, rather, "an offeree is bound by an arbitration clause if 'a reasonably prudent Internet consumer' would be put on 'inquiry notice' of the 'agreement's existence and contents.'" *Dohrmann*, 823 Fed.Appx. at 423, quoting *Long*, 200 Cal.Rptr.3d at 123.

The Ninth Circuit, in *Lee* and *Dohrmann*, had opportunity to discuss the two "typical" type of Internet contracts that are relevant to this case: "clickwrap" or "browsewrap" agreements. *Dohrmann*, 823 Fed.Appx. at 483; *Lee*, 817 Fed.Appx. at 394. Clickwrap agreements are those in which website users are required to click on an "I

agree" box after being presented with a list of the terms and conditions of use; and browsewrap agreements are those in which a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen. *Dohrmann*, 823 Fed.Appx. at 483.

The validity of a browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions. *Dohrmann*, 823 Fed.Appx. at 483-84. The Ninth Circuit is "'more willing to find the requisite notice for constructive assent where the browsewrap agreement resembles a clickwrap agreement—that is, where the user is required to affirmatively acknowledge the agreement before proceeding with the use of the website.'" *Lee*, 817 Fed.Appx. at 394, quoting *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014). "Likewise, 'where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound, courts have been more amenable to enforcing browsewrap agreements.'" *Lee*, 817 Fed.Appx. at 394, quoting *Nguyen*, 763 F.3d at 1177; *Dohrmann*, 823 Fed.Appx. at 484. Courts are directed to look to the conspicuousness and placement of the "Terms of Use" hyperlink, other notices given to users of the terms of use, and the website's general design in assessing whether a reasonably prudent user would have inquiry notice of a browsewrap agreement. *Dohrmann*, 823 Fed.Appx. at 484.

The court finds instructive, and persuasive, the district court's decision in *In re Ring LLC Privacy Litigation*, 2021 WL 2621197 (C.D. Cal. June 24, 2021). In that case, the plaintiffs sued Ring in a class complaint alleging that Ring's security systems were

defectively designed without sufficient security protocols, leaving the plaintiffs who used the system vulnerable to cyberattack, identity theft, and physical harm.  The relevant temporal period when the plaintiffs purchased and used the Ring products was July 2017 to December 2019.

The exterior packaging of the Ring video doorbell and camera products stated either that "[u]se of the product is subject to your registration with Ring and your agreement to the Terms of Service found at www.ring.com" or that "[u]se of the product is subject to your registration with Ring and your agreement to the Terms of Service found at www.ring.com/terms."[3]  In order to set up and use the device, the user had to download the Ring app and register for a Ring account, either through the Ring app or Ring website.

From May 2017 until June 2018, the user was required to check a box during the account registration process to indicate agreement to the Terms before moving on to the next step of the registration process.  From June 2018 through January 2020, the user was required to create a password at the last step of the account registration process, and was notified that by completing account registration they agreed to the Terms.  The user was then required to click a button that appeared below the text notifying the user that by continuing with account registration, the user indicated assent to the Terms.

---

[3]As in the instant case, the court's information concerning the Ring product packaging, Terms of Service, and online account registration came from the declaration of John Modestine.  *Ring LLC Privacy*, 2021 WL 2621197, at *2.

The user also had the option of registering for a Ring account via Ring's website. From February 2018 until April 2019, the user was required to check a box agreeing to the Terms to proceed in creating an account on the website. From April 2019 through January 2020, the text "[b]y continuing you agree to Ring's Terms of Service" appeared directly above a large "Create Account" button.

Since August 18, 2017, all iterations of the Terms included an arbitration clause and class waiver. The section entitled "Dispute Resolution" stated that "[t]he Federal Arbitration Act (the 'FAA') ... and federal arbitration law apply to this Agreement and govern all questions as to whether a dispute is subject to arbitration." The section further stated that the parties "agree that any dispute, controversy, or claim arising out of, or relating to your use of the services and products, to this agreement, or to the content, any relationship between us and/or any recording on the services and/or products shall be resolved only by final and binding, bilateral arbitration."

The Terms also stated that "[d]isputes shall include, but are not limited to, any claims or controversies between you and Ring against each other related in any way to or arising out of in any way from this Agreement, the Services, the Products, and/or the Content[.]" In addition, the Terms provided that "[t]he term 'you,' as used in these Terms, includes any person or entity who is the owner of the Product and creates an account associated with the Product ('Owner'), as well as any person or entity authorized to access or use the Owner's Products and Services ('Authorized Users')."

Since August 18, 2017, the Terms contained a delegation clause stating that the arbitrator "shall have exclusive authority to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of these Terms, including, but not limited to any claim that all or any part of these Terms are void or voidable, or whether a claim is subject to arbitration."

In support of its motion to compel arbitration, Ring argued that because each plaintiff purchased a Ring product, created a Ring account, and/or used Ring's services, each plaintiff also consented to Ring's Terms of Service, which required individual arbitration for all disputes arising out of or relating to Ring's products or services. Specifically, Ring argued that each plaintiff was put on constructive notice of the arbitration clause by one or more of the following: (1) the products' packaging; (2) the Ring app or website when signing up for and creating a Ring account; and (3) the litigation.

The court noted that there was no evidence that the plaintiffs had actual knowledge of the arbitration clause, and, as a result, the validity of the arbitration clause "turn[ed] on whether the [packaging, App, or Website] put[ ] a reasonably prudent user on inquiry notice of the terms of the contract." *Ring LLC Privacy*, 2021 WL 2621197, at *4, quoting *Nguyen*, 763 F.3d at 1177. The court wrote that "[t]o determine whether a user has inquiry notice of the contract terms, courts assess 'the design and content of the website and the agreement's webpage[,]' including 'the conspicuousness

and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design.'" *Ring LLC Privacy*, 2021 WL 2621197, at *4, quoting *Nguyen*, 763 F.3d at 1177.

The court then went on to discuss the recent developments in case law concerning clickwrap and browsewrap agreement as articulated in the *Nguyen*, *Lee*, and *Dohrmann* decisions.  Surveying case law, the court concluded that "[w]hile other persuasive authorities are all over the map in terms of what website features are sufficient to provide inquiry notice, it appears that the majority of California district courts take the *Dohrmann* and *Lee* approach[,]" holding "that a modified or hybrid clickwrap/browsewrap agreement constitutes a binding contract where the user is provided with an opportunity to review the terms of service in the form of a hyperlink immediately above or below a button that must be clicked to affirmatively acknowledge the terms, place an order, or register for an account."  *Ring LLC Privacy*, 2021 WL 2621197, at *5 (citing cases).

Applying the *Dohrmann* and *Lee* approach to Ring's account signup, the court found that "at least four versions" of the account signup page (dated May 2017 to June 2018) resembled a clickwrap agreement "in that they required the user to affirmatively acknowledge the agreement before the user could create the account[,]" and that "Ring's Terms of Service in these four versions of the Ring App and Website are even more conspicuous than the terms of use in *Dohrmann* and *Lee* because they required users to check a box affirmatively indicating that they agreed with Ring's Terms of Service before users could proceed to creating an account."  *Ring LLC Privacy*, 2021 WL

2621197, at *6.  "As in *Dohrmann* and *Lee*, the warning statement also hyperlinked the Terms of Service containing the arbitration clause[,]" and thus "[t]hese four versions of the Ring account signup page provided sufficient notice to a reasonably prudent internet user of Ring's Terms of Service and arbitration clause." *Ring LLC Privacy*, 2021 WL 2621197, at *6.

The court then found that three other versions of the Ring app and website (from July 2018 to present) contained "an explicit textual notice that creating an account will act as a manifestation of the user's intent to be bound by the Terms of Service[,]" and that "[t]hese versions of the Ring App and Website are arguably more conspicuous than the sign-in page in *Dohrmann* because the pages are less cluttered." *Ring LLC Privacy*, 2021 WL 2621197, at *6.  The court wrote that "[i]n at least in two versions [dating from May 2019 on the Ring app and from April 2019 on the Ring website, the same interfaces at issue in the instant case], the warning text likewise appears directly above or below the create account button, and hyperlinks the Terms of Service, as denoted by the blue text." *Ring LLC Privacy*, 2021 WL 2621197, at *6.  The court concluded that "[t]hese two versions of the App and Website provided sufficient notice to a reasonably prudent internet user of Ring's Terms of Service and arbitration clause." *Ring LLC Privacy*, 2021 WL 2621197, at *6.

The court further found that, "[a]lthough the version of the Ring App depicted in Exhibits N and O [dating from June 2018 to April 2019] does not hyperlink the Terms in blue text, the warning text appears immediately below where the user enters her password, the Terms are underlined, and there are hardly any other words on the

page." *Ring LLC Privacy*, 2021 WL 2621197, at *6.   While the court found it to be "a much closer call," it ultimately determined "that this version of the Ring App also provided sufficient constructive notice of the Terms."  *Ring LLC Privacy*, 2021 WL 2621197, at *6.

Finally, the court rejected the plaintiffs' argument that *Dohrmann* was "distinguishable because TurboTax users received notice of the terms of use every time they signed in to their accounts, whereas here, Ring notified users of the Terms of Service only once at the time of sign up."  *Ring LLC Privacy*, 2021 WL 2621197, at *6.  The court determined that the "problem with this argument [was] that the Ninth Circuit's determination in *Dohrmann* did not turn on the fact that users received notice of the terms of use multiple times, but that the location and color of the hyperlinks, as well as the uncluttered design of the Website, made the warnings and terms of use sufficiently conspicuous."  *Ring LLC Privacy*, 2021 WL 2621197, at *6.

As described above, the Ring app and website account setups from *Ring LLC Privacy* are identical to the ones at issue in this case, in particular the account setup interface from July 2018 to present.[4]  Compare *Ring LLC Privacy*, 2021 WL 2621197, at *2-3, 5-6, with, supra pgs. 6-11.  Further, as in *Ring LLC Privacy*, Plaintiffs do not dispute that Modestine's declaration accurately describes the function and appearance of the Ring app and website account setup.  Nor do Plaintiffs dispute that, in order to use the Product as they allege they did in the Amended Complaint, Plaintiffs would have had

---

[4]Because the court finds the notice provided by the Ring website and app account signup pages dispositive of the issue of whether a valid arbitration agreement existed, the court need not discuss the notice provided by the Product's exterior packaging.

to engage in and complete the registration process as described and as it existed from 2019 to present.  Rather, Plaintiffs argue only that they did not have reasonable notice of the arbitration agreement and did not manifest assent to it because: (1) the app and website account registration process requires "no affirmative action" by Plaintiffs to agree other than their use of the Product; and (2) although Plaintiffs did encounter the Terms of Service at the same time that they consummated their registration, "the respective screens contain numerous hyperlinks which contribute to the general clutter of the screen," including a privacy notice and a button "if the user already has an account," which dilutes the effectiveness of the notification informing customers "that hitting 'Create Account' represents assent to the Terms."

For the same reasons stated by the court in *Ring LLC Privacy*, this court finds Plaintiffs' arguments in this respect unavailing.  Plaintiffs purchased and used the Product, and thus signed up for accounts on the Ring website or app, between 2019 and 2021, as a customer could not set up the Product or access the app without going through the registration process and accepting Ring's Terms of Service.  The "Password Creation" page from October 2018 to May 2019 explicitly told the user that they were agreeing to the Terms of Service by signing up, with a hyperlink to the Terms of Service, which included the arbitration agreement and class waiver.  This language was prominently displayed immediately below where a customer was required to input a password.  The same applies for the updated Ring account registration pages from May 2019 and September 2020.  All versions contained a variation of the Password Creation page, requiring the customer to create a password for the account, and prominently

advising the customer that, by doing so, they were agreeing to the Terms of Service, with the Terms of Service, including the arbitration agreement, hyperlinked.  Finally, all the versions Plaintiffs would have seen required the customer, after creating the password, to click a button (whether "Done" or "Create Account"), affirmatively accepting the Terms of Service, prominently and conspicuously displayed directly above or below the button to be clicked.

The web pages in question, whether on the website or app, prominently and clearly display the Terms of Service to which the customer is agreeing by creating and registering their account.  The Terms of Service are hyperlinked, directly providing the customer with the opportunity to review the Terms, including the arbitration agreement, before proceeding.  Contra Plaintiffs' argument, the versions of the Ring app and website that existed during this period contained "an explicit textual notice that creating an account will act as a manifestation of the user's intent to be bound by the Terms of Service[,]" and "are arguably more conspicuous than the sign-in page in *Dohrmann* because the page is less cluttered."  See *Ring LLC Privacy*, 2021 WL 2621197, at *6.  The "Create Password" page is hardly "cluttered" with hyperlinks.  The only other "clutter" on the page is the "Privacy Notice," but that does nothing to "dilute" or detract from the clear presence of the Terms of Service hyperlink.

Plaintiffs validly assented to Ring's Terms of Service, including the arbitration agreement, when they created their user accounts on the Ring app website, where the app or website displayed the phrase, "By continuing you agree to Ring's Terms of Service" and by clicking the "Done" or "Create Account" button when creating their

account, where the "Terms of Service" was displayed in blue font and contained a hyperlink to Ring's Terms. See *Lee*, 817 Fed.Appx. at 394-95. Thus, Ring's website required users to "affirmatively acknowledge the agreement before proceeding," and "the website contain[ed] an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound[.]" See *Lee*, 817 Fed.Appx. at 395, citing *Nguyen*, 763 F.3d at 1176-77. Plaintiffs cannot avoid the terms of the arbitration agreement on the ground that the page displaying the Terms of Service hyperlink was too "cluttered" or that they were not required to actively agree to the Terms of Service themselves by clicking on a button, especially when they had a legitimate opportunity to review it. See *Lee*, 817 Fed.Appx. at 395. Thus, the court finds that a valid arbitration agreement between the parties exists.

For the above reasons, Ring's Motion to Compel Arbitration is GRANTED.

Arbitration Does Not Encompass Class Claims

Next, Ring argues that Plaintiffs can only proceed in individual, not collective, arbitrations. The arbitration agreement in the Terms of Service clearly state, at the very beginning, that the Terms contain information about a "class action waiver, and an arbitration provision, requiring [the user] to arbitrate any claims [they] may have against Ring on an individual basis." The Terms include a section, in all caps, stating "WE EACH AGREE THAT ANY DISPUTE RESOLUTION PROCEEDINGS WILL BE CONDUCTED ON AN INDIVIDUAL BASIS AND NOT IN A CLASS, REPRESENTATIVE OR PRIVATE ATTORNEY GENERAL ACTION."

The court finds that the arbitration agreement validly requires Plaintiffs to arbitrate their claims individually, and not as a class.  See *Lee v. Uber Technologies, Inc.*, 208 F.Supp.3d 886, 889, 894 (N.D. Ill. 2016) (enforcing arbitration agreement requiring arbitration disputes to be resolved on individual, not class, basis).  Plaintiffs do not argue otherwise.

<u>Issues of Arbitrability are Delegated to the Arbitrator</u>

Finally, in applying the FAA, the U.S. Supreme Court has "held that parties may agree to have an arbitrator decide not only the merits of a particular dispute but also 'gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.'" *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S.Ct. 524, 529 (2019) (cleaned up), quoting *Rent-A-Center West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010).  The Court has "explained that an 'agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other.'" *Henry Schein*, 139 S.Ct. at 529, quoting *Rent-A-Center*, 561 U.S. at 70.

The Terms of Service clearly, and unmistakably, state that "the arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability, or formation of these terms, including, but not limited to any claim that all or any part of these Terms are void or voidable, or whether a claim is subject to arbitration."  Because this clause clearly and unmistakably delegates threshold issues to an arbitrator,

including arbitrability and enforceability, the court will not resolve any disputes as to whether any particular claim is arbitrable, and will defer to the arbitrator. See *Ring LLC Privacy*, 2021 WL 2621197, at \*6, citing *Henry Schein*, 139 S. Ct. at 530 (explaining that, before referring a dispute to an arbitrator, a court must first determine whether a valid arbitration agreement exists; if the agreement does exist, and "if it delegates the arbitrability issue to an arbitrator, the court may not decide the arbitrability issue").

*Motion to Dismiss*

Since the court has granted Ring's request to compel arbitration, the court need not rule on whether Plaintiffs' claims should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

*Status of Case*

This case was administratively closed on June 1, 2022, pending resolution of the instant motion. Because the court has compelled arbitration, this case will remain administratively closed.

IT IS THEREFORE ORDERED:

(1)    Ring's Motion to Compel Arbitration or Dismiss First Amended Class Action Complaint (#19) is GRANTED.

(2)    This case remains administratively closed until arbitration has been held in accordance with the terms of the arbitration agreement found in Ring's Terms of Service. The parties are hereby COMPELLED to resort to arbitration.

(3)     The parties are ordered to file a status report in February 2023, and every

August and February thereafter until the arbitration is complete, and to

file a final status report within 30 days of the completion of the arbitration.

ENTERED this 31st day of October, 2022.


s/ COLIN S. BRUCE
U.S. DISTRICT  JUDGE